ENNIS v. H. BORNER & CO., Limited.

(Circuit Court of Appeals, Third Circuit. February 5, 1900.)

No. 4.

SALE—ACTION FOR PRICE—FRAUDULENT CONCEALMENT OF FACTS.

Plaintiff, an English corporation, sold defendant three cargoes of ore, to be paid for in accordance with test analyses made at the port of delivery by one of two chemists named, who was to be selected by plaintiff. Plaintiff, however, requested defendant to make the selection, and notify it of the same. This was not done, but on the arrival of the first cargo defendant had the ore sampled and analyzed by both chemists, and sent plaintiff a copy of the lower analysis, together with a draft, in settlement on that basis, which plaintiff accepted. The same course was pursued, and the analysis of the same chemist used with the second and third cargoes, but the grade shown was so low that it was not satisfactory to plaintiff, which asked to have the ore resampled, and received answer that it could not then be done. Defendant sold the ore in accordance with the other analysis, which made the grade materially higher, but at no time disclosed the fact of such analysis to plaintiff. *Held*, that he was bound, in good faith, to do so, and, having concealed the fact when reporting the first assay, its acceptance by plaintiff was not a selection of the chemist making it, under the contract, which precluded plaintiff from recovering from defendant in accordance with the analysis by which he sold.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

Alexander Simpson, Jr., and John Samuel, for plaintiff in error.

John G. Johnson, for defendant in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an action of contract brought by the plaintiff below, a corporation organized and doing business under the laws of the kingdom of Great Britain, and as such a citizen thereof. The defendant is a citizen of the state of Pennsylvania, residing in the Eastern district thereof, and trading under the name of Ennis & Co. The plaintiff claimed of defendant the sum of $6,786.06, with interest from various dates, as set forth in the statement of plaintiff's demand. The claim rests upon the following facts, as alleged and proved by plaintiff, and for the most part admitted or undisputed:

On the 18th day of February, 1897, plaintiff entered into a contract with defendant to deliver to defendant three steamers' cargoes of Caucasian manganese ore, of the usual merchantable quality, for the price or sum of 10¼d. per unit of metallic manganese, per ton of 2,240 lbs., in ore dried at 212° Fahrenheit, moisture deducted from weight, delivered at Philadelphia. This contract was in writing, and a copy thereof, as proved, is set out in the record. The plaintiff performed its part of the contract by the delivery of three steamers' cargoes of said ore, as follows: Cargo of the steamer Jordan, on or about May 3, 1897; cargo of the steamer Tottenham, on or about June 7, 1897; cargo of the steamer

Fthelwalda, on or about July 1, 1897. Said cargoes were duly accepted by the defendant. In order that the number of units of metallic manganese in said cargo, and the amount of moisture contained therein, should be determined, it was by said contract provided: "For sampling and analysis: Sellers to appoint Andrew S. McCreath, Esq., or Messrs. Booth, Garrett & Blair, and his or their results are to be final and binding." In a letter of April 6, 1897, the seller, notifying the buyer of the sailing of the Jordan cargo, says: "Will you please allow the shipper's representative, Mr. Lavino, of New York, to look cursorily at the sampling of the above steamer." Also: "Kindly say who you will appoint as chemist, and we will wire you if we dissent. Please cable as to this." In a letter dated Philadelphia, April 16, 1897, the buyer acknowledges receipt of the letter of the 6th, and says he has no objection to Mr. Lavino being present at sampling. Also: "As to who will sample the Jordan cargo, it will be, as per contract, either A. S. McCreath or Booth, Garrett & Blair." In a letter dated London, April 22, 1897, from the seller to the buyer, is the following: "We shall be glad to hear from you when you have decided as to which of the two firms is going to sample the cargo." Nothing more was said, so far as the record discloses, between buyer and seller, as to the appointment of either of the chemists named in the contract of sale, until the buyer, Andrew J. Ennis, wrote to the seller, under date of May 18, 1897, after the delivery of the cargo by the steamer Jordan, in which he says: "We have your valued favor of the 1st inst. and 4th inst.; also cables of 13th and 17th idem., SS. Jordan. Herewith please find quotation certificate of assay, vouchers, and bank draft on London for 217. 4s. 9d. to balance. We have mailed you a sealed sample of the cargo." In this letter are inclosed two documents, the one being the liquidation of cargo, giving gross tons less moisture, by Booth, Garrett & Blair; also the result of their analysis, giving the number of units of metallic manganese, and the calculation of the amount due at 10¼d. per unit. This is all the letter contained. There is no reference to the appointment of either of the chemists named in the contract, except by the inclosure of Booth, Garrett & Blair's analysis, upon whose certificate of assay "vouchers and bank draft on London" are sent. In the absence of other conflicting testimony, this would seem sufficient to go to the jury, as tending to show a selection of Booth, Garrett & Blair as the sampling chemists, pursuant to the request of the seller. This action of Ennis & Co. was apparently accepted as done in good faith by the sellers, as appears from its letter of May 28, 1897, part of which is as follows: "Messrs. Ennis & Co., Philadelphia—Dear Sirs: We have your favor of the 18th inst., with statement of account per SS. Jordan, showing a balance in our favor of 217. 4. 9., for which you remitted us your check, for which we are obliged." About June 7th the Tottenham arrived at Philadelphia with a cargo of the ore. A letter dated Philadelphia, June 14, 1897, from buyer to seller, has the following: "P. S. We inclose certificate of analysis of Tottenham cargo, and will forward liquidation of this as soon as City of Truro is ready. The Tottenham results are very disappointing. We send you by mail to-day chemists' sealed sample of this cargo." Inclosed in this letter is a short note from Booth, Garrett & Blair, giving the result of their analysis; also inclosed is a liquidation note, on the basis of that analysis. A cargo of the ore arrived by the steamer Ethelwalda about the 1st day of July, 1897. A letter of July 13, 1897, from buyer to seller, is as follows: "In receipt of your favor of July 1st, and wire of even date, we beg to hand you final papers and liquidation, showing £771. 10. 1. in your favor, for which please find herewith London Bank draft to cover. This concludes all engagements between us. We refrain from any extended comment on the quality of your last two cargoes of Caucasian manganese ore, except to say that if you cannot ship mineral as rich as that of your competitors you will not be able to hold your customers." Of this cargo, also, Booth, Garrett & Blair took the samples and made the analysis, upon which liquidation was had. It also appears from the testimony that the assay of the Tottenham's cargo was unsatisfactory to the shipper, as showing less than the average quantity of metal. In a letter from seller to buyer, dated June 25, 1897, occurs the following: "Tottenham: The dispatch is satisfactory, but the output is disappointing. In regard to the analysis, we cannot believe it is correct, and we telegraphed you to ask Booth to repeat his test." In answer to this, it appears that Ennis & Co. sent to the seller a redetermina-

tion of the manganese by Booth, Garrett & Blair, from the same sample already taken, and confirming the former result. In response to the letter of July 13, 1897, above quoted, the seller, on July 24, 1897, sent the following: "July 24th, 1897. Messrs. Ennis & Co., Philadelphia—Gentlemen: We are in receipt of your favor of the 13th inst., with inclosures. Ethelwalda: We are absolutely at a loss to understand the result of this cargo, and have to-day telegraphed you asking if it is possible to resample at Carnegie works. We simply cannot believe that the cargo, which was shipped from a first-class mine in Potu, could have given such a result; and, while we are on the subject, we will say that we did not give Mr. Lavino any instructions to attend to the sampling or to be present on our account. We have nothing to do with this gentleman, and Mr. Vardopulo had nothing to do with this cargo either. It was not shipped on our contract with him. We fear there must be a terrible mistake somewhere in the sampling." A telegram was also sent on same date from seller to buyer, as follows: "London, July 24th, 1897. Bornennis, Philadelphia: Shippers insist resampling Ethelwalda." To this, Ennis & Co. replied by cable as follows: "Ethelwalda resampling impossible. Cargo was dumped at works with other cargo, and identity lost."

From the testimony of the defendant, who was called by plaintiff's counsel, it appears that, at the time he received the analysis from Booth, Garrett & Blair of samples of the three cargoes, he at the same time had analysis of samples taken by Andrew McCreath, the other chemist mentioned in the contract. The analysis of McCreath showed a higher percentage of metallic manganese in each cargo than did that of Booth, Garrett & Blair. In the case of the cargo of the Jordan, the analysis of Booth, Garrett & Blair found less metallic manganese than McCreath, to the value of £57; in the cargo of the Tottenham, the amount of difference in value was £449, or about $2,200; and in the cargo of the Ethelwalda, the difference in value was £887, or about $4,300, —so that by the McCreath analysis the three cargoes were more valuable than they were by the Booth analysis by £1,394, or about $6,786. By McCreath's analysis, also, it appears that all the cargoes were a little above, instead of below, the standard. By Ennis' own testimony, also, it appears that he had these different analyses simultaneously, and that when he sent the Booth, Garrett & Blair analysis to the seller, as the basis of liquidation, he knew that there was this important difference in the results obtained by the two chemists. In his testimony he says that when he sent the analysis of Booth, Garrett & Blair to the seller, with his draft in liquidation on that basis, he also sent a sample taken by McCreath from the Jordan cargo. This fact is not mentioned in any letter in evidence, and, in fact, Ennis says that he did not mention it, as the sample would speak for itself; but he did not send, and does not say that he sent, the analysis of McCreath in the case of that cargo, or of the two following, nor did he give any intimation to the seller that such an analysis had been made, nor does he claim to have sent any other sample taken by McCreath, except in the case of the first cargo, where it appears the difference in results was inconsiderable. From the testimony of Mr. Lavino, also, it appears that he was present, as requested, at the sampling of the cargo, but had no knowledge of any other sampling or analysis than that made by Booth, Garrett & Blair. Ennis also testifies that the three cargoes were sold by him to Carnegie, and were transferred directly from the ships to the cars, to be delivered to the said Carnegie; that he settled with Carnegie on the McCreath analysis, almost at the same time that he settled with the Borners on the Booth analysis, and that they differed in extent of valuation of about 1,300 and odd pounds.

When Ennis, the plaintiff in error, was testifying before the court below, he was asked to explain his conduct, and the following is taken from his testimony, as set forth in the record: "Q. And you took care to send a copy of this letter [the letter of Booth, Garrett & Blair] to the plaintiffs when you sent your settlement, did you not? A. I sent them a copy. Q. You did not inform them of the fact that you had in your hands at that moment the analysis upon which you were going to settle, showing that it was above the average, did you? You did not say a word to them about that? A. They had declared their chemist. It was not within my province to send them anything but the certificate of the man whom they had declared. Q. The fact is that when you

wrote that letter to Booth, Garrett & Blair, and when you sent the copy of that letter speaking about the deterioration in quality, you did not say one word about the analysis showing it was above the average, which McCreath had given, upon which you were going to settle with Carnegie, did you? A. I made no reference except to Booth, Garrett & Blair's analysis. Q. At the time you wrote your letter of the 13th of July to the seller, in which you sent a copy of your correspondence with Booth, Garrett & Blair, asking them to redetermine, and stating what we have just said, and sent your liquidation of the amount, you did not tell them anything about the sampling and the analysis that had been done by McCreath. You wrote this letter. Then let me ask you why you wrote it: 'In respect of your favor of July 1st and wire of even date, we beg to hand you final papers, liquidation showing 771 pounds, 10 shillings, and 1 pence in your favor, for which please find herewith London Bank draft to cover. This concludes all engagements between us. We refrain from any extended comment on the quality of your last two cargoes of Caucasian manganese ore, except to say that if you cannot ship mineral as rich as that of your competitors you will not be able to hold your customers.' Now, at the time you wrote them that letter, you had the analysis on which you settled, had you not, showing that McCreath found that the Jordan cargo had been 51.127, or 1.487 above the average, and the Ethelwalda 51.552, or 1.552 above the average, had you not, and you were actually getting paid for that ore upon the basis of its being rich ore when you wrote that you refrained from comment, but if they could not ship mineral as rich as their competitors they would not be able to hold their customers. This is so, is it not? A. That was a proper expression of opinion. Q. Would you like to explain? A. Yes, sir; I would be very glad to. If with so able a corps of samplers, and men who have been in the business many years, a difference as to analytical results comes to pass between experts. why should I, as a commercial man, undertake to say which is right? We can only go upon the strict lines of our contract. If the seller decides upon one man, and in this case he had everything his own way, I simply said to him: 'Take anybody you please. Send anybody you please.' He did not nominate his chemist. I put both on, sent him both samples, and let him choose for himself. He selected Booth, Garrett & Blair for the life of his contract. I elected McCreath with my consumers. By the Court: Q. Did you say you sent him both analyses? A. I sent him the written analysis of Garrett & Blair, and sent McCreath's sealed sample, so their own chemist might determine the two, and check them. By Mr. Johnson: Q. Will you point to any letter in which you spoke of sending any other than one sample? A. Yes, sir; I will refer to their reply to me, in which they say their chemist Patterson— Q. Let me have a letter in which you say you send more than one sample? A. I did not write them to that effect; I sent the sample. Q. Did you not say you sent them a sealed sample? A. That referred to this Garrett & Blair's analysis. The other sample went with it. McCreath's went with it. Q. Did you say it was McCreath's sample? A. It was not necessary. Q. You sent no analysis of McCreath's, did, you? A. I sent it so their own chemist might make a test from the sample itself, not from any written report."

With regard to the request of the seller, in his letter of July 24th. asking for a resampling of the third cargo (the Ethelwalda), the following is the testimony of the plaintiff in error: "By Mr. Johnson: Q. You telegraphed them, did you not, in reply to that: 'Ethelwalda resampling impossible. Cargo was dumped at works with other cargo, and identity lost.' That was your reply, was it not? A. That is the ordinary course of business. Q. Why did you not then, instead of saying it was impossible to resample, say, 'I have got in my possession samples taken and an analysis made by McCreath, which samples were taken and analysis made before the identity of the cargo was lost'? A. I had no right to talk to them about McCreath. They settled the Jordan cargo. They elected, on the Jordan, Booth, Garrett & Blair, and their work was to endure for the life of the contract. If McCreath had made results lower than Booth. Garrett & Blair, would they have considered my offering them such samples? Q. That is your explanation, is it, of the reason why, when they wanted a resampling, with this terrible result made, that instead of telling them there were samples you had taken, you told them there could be no

resampling, because the identity of the cargo had been lost, owing to dumping, and that was your answer? A. Yes, sir."

As the facts hereinbefore stated depend upon documentary evidence, much of which was produced by the plaintiff in error, and none of which was disputed, and upon Ennis' own testimony, there was little left for the jury, except to determine the true relation of the parties to the contract, under the instruction of the court. The court below charged the jury generally, and upon the specific points raised by plaintiff. This charge, as set out at length in the record, we consider to have been exceedingly fair to the plaintiff in error, the defendant below, and as favorable to him as the evidence would warrant.

The assignments of error are as follows:

"(1) The court below, in answer to defendant's sixth point, viz. '(6) The verdict must be for the defendant,' erred in charging the jury as follows: 'The court must deny the sixth point.' (2) The court below erred in charging the jury as follows: 'And when the defendant undertook to select one of the two chemists named at the plaintiff's instance, and did select Booth, Garrett & Blair, and forwarded their report accordingly, good faith required that he should inform the plaintiff that McCreath had at that time also sampled and analyzed the ore, and found the quantity to be greater than that found by Booth, Garrett & Blair.' (3) The court below erred in charging the jury as follows: 'If you find that the defendant selected Booth, Garrett & Blair after he had learned that their estimate was lower than that of McCreath, and that the plaintiff acquiesced, and that settlement was obtained or made in ignorance of this fact, as before stated, the plaintiff is not bound by the estimates and settlements, otherwise, he is.'"

We agree with the position taken by the learned judge in the court below, as set forth in the second and third assignments of error. The first assignment of error enables us to go further, and say that the evidence did not justify any other verdict than a verdict for the plaintiff. There was ample ground for the jury to find that the acquiescence of defendant in error, in the selection of Booth, Garrett & Blair as the sampling chemist, was procured by the suppression of facts by the plaintiff in error which he, in good faith and honorable dealing, ought to have communicated to the defendant in error, and that an acquiescence thus procured was a fraud upon the said defendant in error, and therefore not binding upon it.

The real object of providing for sampling and analysis by impartial chemists was to ascertain the quantity of metal to be paid for. This ascertainment was the crux of the contract. It was to be done at the port of delivery, under the supervision of the buyer, by one of two chemists, to be designated by the seller. The seller, foregoing its privilege of designating which of the two chemists should do the sampling, courteously asked the buyer to make the designation, subject to its (the seller's) approval, and it appears by the correspondence that it requested the buyer more than once to notify it of his (the buyer's) action in the premises, before the arrival of any of the cargoes. The buyer made no answer, and certainly did not decline the office. If he accepted, there was imposed upon him in morals, and none the less in law, a duty uberrimæ fidei. There is no evidence that the seller made the designation of chemist, as contemplated in the contract, unless its acquiescence in the action of

the buyer, in sending the analysis of Booth, Garrett & Blair, and making it the basis of liquidation and payment in his letter of May 18th, can be regarded as such. But whether it were a mere acquiescence or an original designation, as contended for by the plaintiff in error, it was clearly open to the jury to say that it was brought about by the contrivance of the buyer, and, as we have said before, in either case the same rule of good faith should be applied.

If Ennis, with the two analyses in his possession, and with knowledge of the discrepancy between them, and without disclosing that fact to the buyer, sent the one showing the less quantity, and calling for the smaller payment by him, while he was at the same time receiving payment for the larger quantity, such conduct lacked the element of good faith. No ascertainment of quantity thus made was within the contemplation of the contract, and none such could therefore be binding upon the seller, unless acquiesced in by it after a discovery of all the facts attending the transaction. The cases to which the plaintiff in error refers, where silence of one party to a contract as to matters within his knowledge is held not to be equivalent to concealment, do not apply to the case in hand. Silence is not reprehensible when good faith does not require one to speak. But the question as to when good faith does so require is to be determined on those principles of general morality which are sanctioned by the enlightened conscience of mankind. We find no error in the charge of the court below, and the judgment is therefore affirmed.